2018 IL App (3d) 170025

Opinion filed February 21, 2018

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2018

| | | |
|---|---|---|
| *In re* B.C., | ) | Appeal from the Circuit Court |
| | ) | of the 21st Judicial Circuit, |
| a Minor | ) | Kankakee County, Illinois, |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | Appeal No. 3-17-0025 |
| | ) | Circuit No. 00-JD-80 |
| v. | ) | |
| | ) | |
| B.C., | ) | Honorable |
| | ) | Adrienne W. Albrecht, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE WRIGHT delivered the judgment of the court, with opinion.
Presiding Justice Carter and Justice Schmidt concurred in the judgment and opinion.

**OPINION**

¶ 1     Respondent, B.C., appeals from the circuit court's denial of his petition to terminate registration as a sex offender. B.C. argues that (1) the circuit court improperly interpreted the applicable statute and (2) the court's decision was contrary to the manifest weight of the evidence. We reverse and remand with directions for the court to grant B.C.'s petition to terminate sex offender registration.

¶ 2                                        FACTS

¶ 3        On May 3, 2000, the State filed a juvenile delinquency petition that alleged B.C. was

delinquent in that he had committed four counts of aggravated criminal sexual abuse (720 ILCS

5/12-16(c)(2)(i) (West 2000)). Counts I and III alleged that B.C., who was under 17 years of age

at the time of the offenses, had placed his penis in the mouths of victims T.C. and J.M., who

were under 9 years of age, for the purpose of sexual gratification. Counts II and IV alleged that

B.C., who was under 17 years of age at the time of the offenses, had placed his penis in the

anuses of victims T.C. and J.M, who were under 9 years of age, for the purpose of sexual

gratification.

¶ 4        In May 2000, Dr. Mary Belford evaluated B.C. In her report, Belford said B.C. had no

history of abuse and no evidence of depression, psychosis, or any preexisting psychiatric issues.

Belford said B.C.'s psychological testing was "basically normal except for moderately low

functioning (age-equivalent of ten years old) in communication domains and socialization."

¶ 5        In July 2000, therapist Judith McCormick prepared a second evaluation. In her report,

McCormick said B.C. had a low to moderate risk for sexual reoffense. McCormick based her low

risk opinion on the following factors: (1) B.C. was willing to explore his offenses in a

nondefensive manner, (2) B.C. acknowledged and understood the negative impact of the offenses

on the victims, (3) B.C. was willing to accept responsibility for committing the offenses, (4) B.C.

felt guilty and remorseful because of the negative impact on the victims, (5) B.C.'s parents

acknowledged and understood the negative impact of the offenses on the victims, (6) B.C.'s

parents held B.C. responsible for the offense without externalizing the blame, (7) B.C. had no

history of behavior disorder involving physical aggression, (8) B.C. had a functional family unit,

(9) B.C.'s family was supportive of treatment and willing to be involved in therapy, and (10)

B.C. had no history of behavior or academic problems at school. McCormick cited the following factors in support of her moderate risk opinion: (1) B.C. had two or more documented offenses, (2) B.C. did not understand the exploitive nature of the offenses, (3) B.C. had negative self-esteem, and (4) B.C.'s family was unable to identify problems within the family unit other than B.C.'s deviant sexual behavior.

¶ 6        On August 17, 2000, B.C. admitted to counts I and III of the State's petition. The court adjudicated B.C. delinquent and granted the State's motion to dismiss counts II and IV. The court placed B.C. on reporting probation until August 17, 2005.

¶ 7        In October 2001, Dr. Antoinette Kavanaugh evaluated B.C. In her report, Kavanaugh said B.C. appeared to be making positive strides in therapy, and he had improved his social skills. Kavanaugh noted that assessing B.C.'s risk of reoffense was "not an easy task" because recidivism rates for adolescent sex offenders were low compared to adult sex offenders and a 100% accurate empirical risk assessment did not exist. Nevertheless, Kavanaugh cited the following factors that may reduce B.C.'s likelihood of reoffense: (1) B.C. had no history of juvenile delinquency before the adjudicated offense, (2) since B.C.'s adjudication, he has not had any new involvement with the justice system, (3) B.C. consistently engaged in and demonstrated progress in treatment, (4) B.C. admitted that he committed the offenses, (5) B.C.'s level of denial had decreased, (6) B.C.'s exposure to sexually explicit material had decreased, (7) B.C. did not have a history of being victimized, (8) B.C. did not have a deviant sexual arousal pattern, (9) B.C.'s family was willing to engage in treatment, (10) B.C. was involved in a functional family system, (11) B.C. did not have a history of academic or behavioral problems, (12) B.C. had increased his involvement with peers his age and decreased his involvement with younger peers, (13) B.C. had increased parental and adult supervision, (14) B.C.'s empathy for the victims had

3

increased but was still incomplete, (15) B.C. did not have a history of drug or alcohol use, (16) B.C.'s social skills were increasing, and (17) B.C. was not suffering from a significant emotional or psychological problem. Kavanaugh also cited four factors that may increase B.C.'s likelihood of reoffense: (1) B.C. and his parents continued to display cognitive distortions related to the offense; (2) B.C. and his family did not have sufficient knowledge of the environmental, interpersonal, and family factors that may have contributed to the abuse; (3) B.C. and his family have yet to develop an appropriate level of victim empathy; and (4) B.C. and his family failed to completely understand the exploitative nature of the offenses.

¶ 8        On August 25, 2005, B.C. was discharged from probation. The discharge order noted that B.C. had successfully completed his term of probation.

¶ 9        On April 1, 2016, B.C. filed a petition for termination of sex offender registration. 730 ILCS 150/3-5(c) (West 2016). The petition alleged that (1) B.C. became statutorily eligible to petition for termination on September 1, 2005, (2) B.C. had successfully completed a sex offender treatment program, and (3) according to licensed professional evaluator Pamela Munson, B.C. was a "low risk to re-offend," had a plan for accountability, and was aware of his triggers.

¶ 10        At the hearing on the petition, B.C. testified that he committed the charged offenses when he was 14 years old. Since his convictions, B.C. had graduated from high school and attended 1½ years of community college. After high school, B.C. worked full time at several Taco Bell locations. B.C. had also worked as a manager at a Buffalo Wild Wings restaurant and was then the general manager of the Taco Bell in Crest Hill.

¶ 11        When B.C. pled guilty, he was subject to a 10-year term of sex offender registration. After his plea, the legislature changed the applicable registration term to natural life. B.C. had

4

registered as required since the date of his conviction. B.C. had not been arrested or convicted of any other crimes, and he had not violated his probation. B.C. had also voluntarily completed a sex offender treatment program through the office of Dr. James Simone and Associates. At the conclusion of the program, Munson prepared a risk assessment.

¶ 12 The State called Tammy M., the mother of J.M., to read a victim impact statement. In her statement, Tammy detailed J.M.'s continuing anxiety and emotional distress caused by B.C.'s actions. Tammy acknowledged that people can change, but advocated that B.C. remain on the sex offender registry for as long as possible because of the harm B.C. had caused to J.M.

¶ 13 At the conclusion of Tammy's testimony, counsel for B.C. proffered that, if called to testify, Munson would state B.C. is the "lowest possible risk they would ever say is low which is being—they will never say no risk in an evaluation." The State objected to the proffered testimony, and the court continued the case to allow B.C. to subpoena Munson.

¶ 14 When the hearing resumed, Munson testified that she had notified B.C. via letter that he had successfully completed the sex offender treatment program and had a low risk to reoffend. Munson explained that the sex offender treatment program consisted of three phases: (1) offender check-ins and learning accountability for the deviant behavior; (2) accountability, understanding the cognitive errors that led to the offender's poor choices, and developing empathy and understanding the impact of the offender's actions on the victim and society; and (3) managing and understanding the offender's triggers and high risk areas. These three phases included 18 assignments and took four years to complete. At the end of the program, the evaluators determined whether the offender had changed his erroneous thinking or had merely moved through the steps.

¶ 15    Munson said B.C. enrolled in the program in 2011 and successfully completed it in 2015. At that time, Munson prepared a risk assessment. Munson explained the biggest factor in preparing the assessment was determining whether B.C. understood his actions were wrong and how to prevent the behavior in the future. Munson said the following factors reflected favorably on B.C.'s risk assessment: (1) B.C. had voluntarily undertaken the sex offender treatment program, (2) B.C. had a history of continuous employment, (3) B.C. had a positive family support network, and (4) B.C.'s family understood the program was not about "curing" B.C., but educating and training B.C. to understand the thinking errors that led to the offenses. Munson ultimately determined that B.C. had a "low risk to re-offend." Munson said that neither she nor any of the other evaluators at Dr. James Simone and Associates had ever issued a "no risk to offend" opinion. The only options were "low risk, medium risk, or high risk."

¶ 16    On cross-examination, Munson explained that the sex offender treatment program teaches offenders

> "to accept that there is always a possibility of re-offense. That's a part of why we build and instill in them an understanding of what their triggers are and ways of making sure that they don't get themselves in situations.
>
> Many of our assignments are based on looking at their cycle of behavior and then planning for exits of how to get out of that cycle.
>
> So it's a part of our successful treatment that they understand you cannot ever say, 'I will never re-offend.' You have to understand that the possibility is there, but the risk factor determines how probable that is."

Munson also said she considered the severity of the underlying offenses in the risk assessment, but the more important factor was whether B.C. had any subsequent offenses. Munson was not

6

saying that B.C. had "no risk" to reoffend because she did not "know how the standard can have it as zero risk since that goes against all of the sex-offender-based training that [she has] had; but [she thought] it was written by lawyers, not practitioners."

¶ 17 On redirect examination, Munson said that, based on her experience, B.C. had the "lowest risk possible." B.C. also had fully accepted responsibility for his offenses, understood his triggers, and did not have a strong attraction to children. Munson reiterated "[t]here is no cure. There is only education."

¶ 18 The court initially observed that Munson had testified that the statute is inconsistent with her training and experience because there is always a risk of reoffense. The court then said:

> "I don't get to make those calls. I don't get to make those judgments. I am only allowed to follow the statute. This was a particularly troubling event, which is one of the criteria that I am to consider.
>
> I would concur that the respondent has done everything in his power to rehabilitate himself. There has been no additional incidents. He has gone through treatment. He has successfully gone through treatment and come to be as low a risk as the treatment evaluator is comfortable with certifying.
>
> But that's not what the statute says, and I cannot rewrite the statute. The statute says 'no risk.' I don't get to make those judgment calls. That is not my place as a trial judge. My place is to follow the statute. The word is 'no risk.' And, therefore, the petition—despite all of the compelling evidence with regards to the minimal nature of the risk, the statute has to be followed. And, therefore, I have to deny the petition."

Counsel for B.C. then inquired:

"For clarification for the record, is the only reason that you are finding that there is—you can't make the finding is because of the use of the term 'low risk' in the evaluate—by the evaluator?

THE COURT: And the testimony of the evaluator.

[COUNSEL]: Okay. Which indicates that—okay.

THE COURT: And the nature—the underlying nature—

[COUNSEL]: My only argument is, I don't think that that's the only criteria that you use to make the finding of no risk.

THE COURT: I'm looking at the underlying na—the nature of the underlying offense and the history of the case, which is also part of the statute. I'm looking at all of the statutory criteria. I cannot find in the statutory criteria that there is no risk."

¶ 19                                              ANALYSIS

¶ 20                                   I. Statutory Interpretation

¶ 21        B.C. argues the court improperly interpreted section 3-5 of the Sex Offender Registration Act (Act) (730 ILCS 150/3-5 (West 2016)) and ceded responsibility for making a judgment to persons other than the court. Specifically, B.C. contends that the trial court effectively shifted the judicial decision-making authority to Munson, who found that B.C. posed a "low risk" instead of the statutorily required "no risk." Additionally, B.C. submits that the court's interpretation nullifies section 3-5 because, according to Munson, all assessments will result in, at best, a "low risk" determination.

¶ 22        We review the court's interpretation of section 3-5 of the Act *de novo*. *In re T.J.D.*, 2017 IL App (5th) 170133, ¶ 20. "The primary objective of statutory interpretation is to ascertain and

8

give effect to the intent of our legislature." *People v. Marshall*, 242 Ill. 2d 285, 292 (2011). This inquiry begins with the plain language of the statute, which is the best indicator of legislative intent. *Id.* In interpreting the plain language of a statute, we presume the legislature did not intend absurd, inconvenient, or unjust results. *In re Rufus T.*, 409 Ill. App. 3d 969, 975-76 (2011).

¶ 23    B.C.'s argument is derived from the trial court's interpretation of subsection 3-5(d) of the Act. This subsection provides that once a juvenile sex offender files a subsection 3-5(c) petition, "[t]he court may upon a hearing on the petition for termination of registration, terminate registration if the court finds that the registrant poses no risk to the community by a preponderance of the evidence based upon the factors set forth in subsection (e)." 730 ILCS 150/3-5(d) (West 2016). The language of subsection 3-5(d), stating that the court must find the registrant poses "no risk to the community by a preponderance of the evidence based upon the factors set forth in subsection (e)," is clear and unambiguous. *Id.*; *T.J.D.*, 2017 IL App (5th) 170133, ¶ 23.

¶ 24    The record establishes that the court did not simply adopt Munson's conclusions but rather balanced Munson's testimony together with other statutory considerations in order to formulate a judicial decision. Specifically, the court considered the subsection 3-5(e) factors and observed that although B.C. had "done everything in his power to rehabilitate himself," it was bound by the statutory language that B.C. must show by a preponderance of the evidence that he did not pose a risk to the community. 730 ILCS 150/3-5(d), (e) (West 2016). The court then said it had considered the following subsection 3-5(e) factors: the seriousness of the underlying offenses, evidence of B.C.'s rehabilitation, and the professional risk assessment. When B.C.'s counsel asked for clarification, the court said it had considered all of the factors and the risk

assessment and severity of the offenses weighed heavily in its decision. The court's express consideration of the subsection 3-5(e) factors establishes that it did not cede decisionmaking authority to Munson.

¶ 25    In addition, we conclude the court's interpretation of section 3-5(d) to B.C. did not render the termination proceedings a nullity or impossibility. The legal "no risk" standard of subsection 3-5(d) is necessarily high because this onerous burden strikes a balance between the intent of the Act to protect the public (see *People v. Bonner*, 356 Ill. App. 3d 386, 388-89 (2005) (Act is intended to protect the public rather than punish sex offenders)) and the statutory ability afforded only to juvenile offenders to terminate registration (see *Rufus T.*, 409 Ill. App. 3d at 975 (section 3-5 of the Act is "intended to protect the rights of juvenile delinquents, who have a greater likelihood of rehabilitation, by allowing them the opportunity to petition the court to remove them from the sex offender registry")). It must be recognized that the legislature tempered the high standard of "no risk" by incorporating a preponderance of the evidence burden of proof upon the petitioner. 730 ILCS 150/3-5(d) (West 2016). This statutory burden does not require proof beyond a reasonable doubt and can be satisfied with sufficient evidence to show that a fact is "more likely than not." *T.J.D.*, 2017 IL App (5th) 170133, ¶ 26. We agree that if the burden of proof was beyond a reasonable doubt, the burden, combined with the "no risk" standard would effectively nullify section 3-5, as it is nearly impossible for a sex offender to show no risk of reoffending. See Fredrick E. Vars, *Delineating Sexual Dangerousness*, 50 Hous. L. Rev. 855, 870 (2013) (observing "every sex offender has a greater-than-zero risk of recidivism"). Therefore, the adoption of the preponderance of the evidence burden of proof permitted B.C. to show that he posed "no risk to the community" even though evidence of some of the factors did not weigh in his favor.

¶ 26                                    II. Manifest Weight of the Evidence

¶ 27        Our analysis does not end with the propriety of the court's interpretation of section 3-5 of

the Act, but next considers the court's application of the subsection 3-5(e) factors. B.C. argues

that the court's denial of his petition to terminate registration as a sex offender was contrary to

the manifest weight of the unrebutted evidence submitted to the court regarding the subsection 3-

5(e) factors. B.C. contends the trial court erred by denying the petition.

¶ 28        In order to prevail on his petition to terminate registration, we recognize B.C. bore the

burden to prove by a preponderance of the evidence that he "poses no risk to the community."

730 ILCS 150/3-5(d) (West 2016); *supra* ¶ 23. When deciding whether B.C. satisfied his burden

of proof, the court was required to consider the following factors:

> "(1) a risk assessment performed by an evaluator licensed under the Sex
>
> Offender Evaluation and Treatment Provider Act;
>
> (2) the sex offender history of the adjudicated juvenile delinquent;
>
> (3) evidence of the adjudicated juvenile delinquent's rehabilitation;
>
> (4) the age of the adjudicated juvenile delinquent at the time of the
>
> offense;
>
> (5) information related to the adjudicated juvenile delinquent's mental,
>
> physical, educational, and social history;
>
> (6) victim impact statements; and
>
> (7) any other factors deemed relevant by the court." 730 ILCS 150/3-5(e)
>
> (West 2016).

¶ 29        The preponderance of the evidence burden of proof requires only that B.C. show that it is

"more likely than not" (*T.J.D.*, 2017 IL App (5th) 170133, ¶ 26) that he "poses no risk to the

11

community" (730 ILCS 150/3-5(d) (West 2016)). This standard is less exacting than the criminal beyond a reasonable doubt standard as it does not require B.C. to prove his case beyond all doubt, but that it is "more probable than not" that he poses no risk to the community. See *supra* ¶ 25; *In re K.O.*, 336 Ill. App. 3d 98, 107 (2002).

¶ 30    After considering these factors, the trial court found that Munson's "low risk" assessment, combined with the nature of the underlying offenses and the history of the case, established that B.C. had not shown that he posed "no risk to the community." We review the court's finding under the manifest weight of the evidence standard. See *Eychaner v. Gross*, 202 Ill. 2d 228, 251 (2002). A ruling is contrary to the manifest weight of the evidence where the court's findings are unreasonable or not based on the evidence. *Id.* at 252. In reviewing the court's ruling, we draw all reasonable inferences in support of the court's judgment, and we will only reverse the judgment where the opposite conclusion is clearly apparent. *Id.*

¶ 31    Turning to the subsection 3-5(e) factors, the first factor the court shall[1] consider is the professional risk assessment. B.C. submitted Munson's assessment for the court's consideration. Both sides agreed that Munson categorized B.C. as having a "low risk to re-offend." According to Munson, this was the best result B.C. could obtain because neither she nor any of the other evaluators at Dr. James Simone and Associates could issue a "no risk to offend" opinion. Munson explained a "no risk" opinion was inconsistent with the sex offender treatment program, which emphasized that there was "no cure" and taught B.C. to accept that there is always a possibility of reoffense. To cope with this possibility, the program taught B.C. to avoid or exit trigger situations. Overall, Munson opined B.C. had the "lowest risk possible."

---

[1]Despite the statutory usage of "shall," the court is only directed rather than mandated to consider these factors. See *Rufus T.*, 409 Ill. App. 3d at 975 (concluding that the circuit court's duty to consider the subsection 3-5(e) factors is directory rather than mandatory).

¶ 32    Munson's testimony establishes that "low risk" is the label applied to the most successfully rehabilitated sex offender. Her explanation appears to make a "no risk" assessment, as required by subsection 3-5(d), an unattainable goal. Professional evaluators in other cases have similarly observed that a "low risk" opinion is the lowest option available in these assessments. See *T.J.D.*, 2017 IL App (5th) 170133, ¶¶ 6, 8 (professional evaluator concluded T.J.D. posed "a low risk to the community" and noted that a finding of "no risk" is not possible as some risk for sexual offense exists even in the general population where no prior sexual offense has been identified).[2] We note that the legal standard of "no risk," when measured by a preponderance of the evidence, may be satisfied in spite of a "low risk" assessment by a non-judicial professional evaluating defendant in a clinical, rather than legal, context. Here, Munson's expert testimony indicated that B.C. earned the highest rating a clinician could provide. Thus, based on the unique facts of this case, we conclude that B.C.'s "low risk" assessment weighs in favor of granting the petition.

¶ 33    Second, the court shall consider B.C.'s sex offender history. In this case, B.C.'s history includes two convictions for aggravated criminal sexual abuse that led to his current registration requirement. Specifically, the record establishes that B.C. was 14 years old when he placed his penis in the mouths of two victims who were under the age of 9. Since these are very serious offenses, this factor weighs in favor of denying the petition.

¶ 34    Third, the court shall consider the evidence of B.C.'s rehabilitation. In this case, there is substantial evidence of rehabilitation. Chief among this evidence is the complete absence of subsequent criminal convictions, sex offense charges, probation violations, or sex offender

---

[2]At least two unpublished cases also include testimony from professional evaluators who indicated that a "low risk to reoffend" was the lowest risk category and a "no risk" category is not available in the assessment. See *In re Harold W.*, 2014 IL App (2d) 121235-U, ¶ 12; *In re James D.*, 2015 IL App (2d) 141007-U, ¶ 7.

registration violations. Additionally, after B.C. was successfully discharged from his five-year term of probation, he voluntarily undertook and completed a four-year, 18-part sex offender treatment program. The program caused B.C. to change his erroneous thinking, become cognizant of his triggers, and avoid or exit trigger situations. In the 16 years since the State filed the juvenile delinquency petition, B.C. had graduated from high school and attended 1½ years at a community college. B.C. also had been continuously employed since his graduation and had worked his way through the ranks of the food service industry to become a general manager. B.C.'s academic and employment history show he had developed his social skills and was a positively-contributing member of the community. Accordingly, the evidence of rehabilitation weighs in favor of granting the petition.

¶ 35        Fourth, the court shall consider B.C.'s age at the time of the offense. This factor is particularly important to the court's determination of whether a juvenile offender poses "no risk to the community," as it directly implicates the purpose and intent of section 3-5 of the Act. Section 3-5 is intended to "protect the rights of juvenile delinquents, who have a greater likelihood of rehabilitation, by allowing them the opportunity to petition the court to remove them from the sex offender registry." *Rufus T.*, 409 Ill. App. 3d at 975; see also 95th Ill. Gen. Assem., Senate Proceedings, May 1, 2007, at 14-16 (statements of Senator Raoul).

¶ 36        B.C. was 14 years old when he committed the charged offenses. However, Belford's psychological evaluation indicated B.C. had moderately low functioning, age-equivalent of 10 years old in the domains of communication and socialization. B.C.'s young mental and relatively young physical age weigh in favor of granting the petition. Moreover, this factor directly implicates the intent of section 3-5 of the Act to prevent juvenile offenders from having to spend their adult lives registered as sex offenders, as B.C. has registered for more than 16 years since

14

his juvenile adjudication was entered when he was 14 years old. See *Rufus T.*, 409 Ill. App. 3d at 974. Due to the intent of section 3-5 of the Act and B.C.'s relatively young age at the time of the offense, this factor weighs in favor of granting the petition.

¶ 37    Fifth, the court shall consider evidence related to B.C.'s mental, physical, educational, or social history. In May 2000, Belford reported B.C.'s psychological testing was "basically normal except for moderately low functioning *** in communication domains and socialization." In July 2000, McCormick stated B.C. had a low to moderate risk to commit future sex offenses. Relevant to B.C.'s mental and social history, the moderate risk factors cited by McCormick included B.C.'s failure to understand the exploitive nature of the offenses and B.C.'s negative self-esteem. Kavanaugh's October 2001 report indicated B.C. had worked to remedy at least some of these issues as he had consistently engaged in and progressed in treatment, admitted that he committed the offenses, decreased his level of denial, and expressed some empathy for the victims. Munson's testimony at the hearing on B.C.'s petition to terminate registration established that B.C. had resolved these issues after he completed the sex offender treatment program. In particular, Munson noted that B.C. had accepted responsibility for the offenses and understood his triggers. Based on her evaluation of B.C., Munson opined B.C. had the lowest risk possible. Viewed together, this evidence showed that B.C. made substantial progress in correcting the mental issues that existed at the time of the offense. Further, B.C.'s testimony of his employment history, academic history, and current career established a positive educational and social history following the offenses. Therefore, this factor weighs in favor of granting the petition.

¶ 38    Sixth, the court is to consider the victim impact statement. Tammy, the mother of one of the victims, said her son continues to suffer from psychological issues that resulted from B.C.'s

15

offense. As a result, she urged that the court deny B.C.'s petition. This factor weighs in favor of denying B.C.'s petition. However, it provides very little guidance on the more pertinent issue of whether B.C. poses a risk to the community as a whole. Instead, it establishes the victim's present feelings regarding his offender and the past offense. Understandably, like most victims, this victim does not feel comfortable living in a community with his offender, but this does little to show this offender's risk to the entire community. Accordingly, we find this factor weighs in favor of denying B.C.'s petition.

¶ 39　　Finally, the court is directed to consider any other relevant factors. Here, the court did not consider any additional evidence. Therefore, this factor weighs neither in favor of nor against terminating B.C.'s sex offender registration.

¶ 40　　From our review of the record, the risk assessment, evidence of rehabilitation, age at the time of the offense, and B.C.'s mental, physical, emotional, and social history factors each weigh firmly in favor of granting the petition. The evidence supporting the denial of the petition is limited to B.C.'s sex offender history, which consists only of two, albeit very serious, offenses and the victim impact statement. Therefore, we conclude B.C. met the burden of showing, by a preponderance of the evidence, that he poses "no risk" to the community. 730 ILCS 150/3-5(d), (e)(3) (West 2016). This conclusion is opposite from the court's decision and is clearly apparent from the record. Therefore, we conclude that the court's denial of B.C.'s petition to terminate registration was contrary to the manifest weight of the evidence.

¶ 41　　　　　　　　　　　　　　　CONCLUSION

¶ 42　　The judgment of the circuit court of Kankakee County is reversed and remanded with directions for the court to grant B.C.'s petition to terminate sex offender registration.

¶ 43　　Reversed and remanded with directions.

16