NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 220006-U

NO. 4-22-0006

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 8, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* C.W., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Logan County |
| Petitioner-Appellee, | ) | No. 13JD45 |
| v. | ) | |
| C.W., | ) | Honorable |
| Respondent-Appellant). | ) | Charles M. Feeney, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices DeArmond and Cavanagh concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The appellate court affirmed the trial court's judgment denying respondent's
petition to terminate sex offender registration because (1) the trial court did not
consider any improper factors and (2) the court's judgment was not against the
manifest weight of the evidence.

¶ 2       In May 2015, respondent, C.W. (born February 1998), pleaded guilty to three

counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(2)(i) (West 2012)) in

exchange for an agreed sentence of probation. As a result of his guilty plea, respondent was

required to register as a sex offender pursuant to the Sex Offender Registration Act (SORA) (730

ILCS 150/1 *et seq.* (West 2014)). In April 2021, respondent filed a petition to terminate his sex

offender registration pursuant to section 3-5(e) of SORA (*id.* § 3-5(e)). In September 2021,

following a hearing, the trial court denied respondent's petition.

¶ 3       Respondent appeals from the trial court's denial of his petition to terminate

registration as a sex offender. Respondent argues that (1) the court abused its discretion by considering non-statutory factors that had no bearing on the issue of respondent's risk to the community and (2) the court's decision was against the manifest weight of the evidence. We disagree and affirm.

¶ 4                                    I. BACKGROUND

¶ 5                                    A. The Charges

¶ 6            In September 2013, the State filed a juvenile delinquency petition alleging that respondent was delinquent in that he had committed one count of aggravated sexual assault (720 ILCS 5/11-1.30(b)(i) (West 2012)) and two counts of aggravated criminal sexual abuse (*id.* § 11-1.60(c)(2)(i)). Count I alleged that respondent, who was under 17 years of age at the time of the offenses, had placed his penis the mouth of G.G., who was under 9 years of age, for the purpose of sexual gratification. Counts II and III alleged that respondent had placed the hands of E.G. and M.G., who were also under nine years of age, on respondent's penis for the purpose of sexual gratification. The petition alleged that the offenses occurred between January and June 2013.

¶ 7                                    B. The Plea Hearing

¶ 8            In May 2015, the parties entered into a partially negotiated plea agreement. The State amended count I to charge aggravated criminal sexual abuse to G.G. (*id.*), alleging that respondent placed his penis "on the face of G.G." rather than in her mouth. Respondent pleaded guilty to all three counts of aggravated criminal sexual abuse in exchange for an agreed sentence of probation. The specific terms of the probation would be determined by the trial court at a sentencing hearing.

¶ 9            During the plea hearing, in response to the trial court's questions, respondent

stated that (1) no one had forced or coerced him into pleading guilty, (2) it was his decision alone to plead guilty, (3) he pleaded guilty to count I as amended and counts II and III, and (4) he understood what was alleged in each of those counts.

¶ 10 As part of the factual basis for the plea, the prosecutor stated that between January and June 2013, respondent was 15 years old. The three victims—G.G., E.G., and M.G.—were all under five years old and attended a home daycare run by respondent's mother. G.G. would testify that, while at daycare, respondent placed his penis "on her face." G.G.'s twin sister, E.G., would testify that during the time frame alleged, respondent placed E.G.'s hand on respondent's penis. M.G. (who was unrelated to the twins) would testify that respondent also placed M.G.'s hand on respondent's penis during that same time period.

¶ 11 The trial court found respondent's plea to be knowing and voluntary and ordered the preparation of a "Juvenile Social History" and sex offender evaluation. The court also advised respondent that he "will have a duty *** to register as a sex offender for the rest of your life if I accept this plea." Respondent stated that he understood. The court then advised respondent that he "will have a right to petition the Court after five years. *** [T]here is no guarantee that [such a] petition will be granted." Respondent again stated that he understood and that he wished to persist in his guilty plea.

¶ 12 C. The Sentencing Hearing

¶ 13 1. *The 2015 Sex Offender Evaluation*

¶ 14 In August 2015, the trial court conducted a sentencing hearing. The court first noted that it had received a juvenile social history report, to which a sex offender evaluation was attached. The evaluation was completed by Tom Jenkins of ABC Counseling. Jenkins interviewed respondent's parents for the report. Respondent's mother (1) denied her son

committed the offenses against the three children and (2) alleged that M.G.'s mother did not like respondent's mother and had threatened "to get back at" respondent's family.

¶ 15 Jenkins also interviewed respondent, who was 17 at the time of the evaluation. Respondent denied committing the offenses and stated that his parents, friends, and relatives all knew he did nothing wrong and that he was only present at the evaluation to satisfy the court.

¶ 16 Jenkins used two actuarial instruments to measure respondent's risk to sexually reoffend, which scored respondent as "low risk."

¶ 17 In the "Summary and Recommendations" section of the report, Jenkins wrote the following:

"While [respondent] has consistently stated he has not engaged in any inappropriate sexual behavior, it is this therapist's belief that [respondent] has done the behaviors based on the documents provided for in the completion of the assessment. In reviewing the victims' statements, they are consistent and believable. It is rare for children to 'make up' stories like this, let alone three victims. Currently, [respondent] does have numerous reasons to deny (he has yet to be sentenced, avoidance of further consequences, the support of his parents, etc…) the full extent of the sexual behaviors that he has engaged in. It has been this evaluator's experience that even juveniles that have been adjudicated [delinquent] deny, minimize and justify their behaviors in the initial stages of treatment. Therefore it is not unusual that [respondent] may be in partial denial about the true extent of and effect of his sexual behaviors, as it currently appears he is. It will be important for [respondent's] parents to provide an environment that is conducive to [respondent's] disclosure of any and all sexually

inappropriate behaviors that he has engaged in as well as not provide an environment that supports opportunities to reoffend."

¶ 18    Jenkins recommended, among other things, that respondent engage in counseling on a weekly basis to address issues related to juvenile sexual offending.

¶ 19                                        2. *The Evidence Presented*

¶ 20    The State submitted five written victim impact statements and one that was presented orally. Respondent called two acquaintances of respondent who testified that respondent was hardworking, affable, caring, dependable, and had a bright future. Respondent also submitted a group exhibit of emails attesting to his good character. Respondent then gave a statement in allocution. He did not admit or deny committing the offenses but stated he was "sorry for the impact on the families they have felt [*sic*]" and promised to abide by the terms of probation.

¶ 21                                        3. *The Sentence*

¶ 22    When fashioning respondent's sentence, the trial court emphasized respondent's and his parents' denials that respondent committed the offenses. The court noted that respondent had "never said he was sorry for what he's done" and made the following remarks:

>    "My order is going to reflect the fact that the parents are in denial and the environment in which [respondent] is going to live is going to be one in which his denial is facilitated, and that's a regrettable situation, because what he needs is someone who is going to hold him accountable, someone who *** is going to confront him with the concept that the first step towards rehabilitation is accepting personal responsibility and acknowledging the wrongfulness of one's conduct, not simply saying, I'm sorry you feel so bad, but [rather], I'm sorry for what I did.

There's a drastic difference between those two statements. It is clear to this Court that while [respondent] has pled guilty, the Court accepts the fact that he is very much guilty, that that was all a ploy as well to control the damage, and I appreciate that that's a common tactic, but it was a ploy to control the damage done to [respondent.] *** The idea that this is made up, when children so young from two different homes on separate—two separate occasions can draw pictures containing details that children that age wouldn't know and showing emotion, these photos—not photos, these drawings by these children scream about emotion. They scream about the victimhood that these young girls encountered at the hands of [respondent]. They show erect penis, an erect penis, for instance. They show emotion in the sense of anger, and they show joy on the part of [respondent] at victimizing them. They show fear. They show disgust. All of that is in there. And these little girls are so manipulated by adults as to just make this up and able to draw that when given the opportunity? That's delusional if you think that.

The Court is, based on [respondent's] plea alone, but based on all the other evidence, absolutely convinced beyond any doubt [respondent] did these things. He needs help. *** If he remains in denial and this denial is facilitated and he is allowed to exist in this delusional concept that he didn't do this and that he—this is all a frame-up, I mean I got news for you; he's going to do it again."

¶ 23    The trial court sentenced respondent to a term of probation until he reached the age of 21. The court emphasized that respondent was to complete "all recommended treatment" within two years. The court further ordered respondent's parents to complete psychosocial

- 6 -

educational classes as recommended in the sex offender evaluation. Last, the court required respondent to comply with the requirements of SORA (730 ILCS 150/1 *et seq.* (West 2014)).

¶ 24                    D. The Direct Appeal and Modifications to Probation

¶ 25          Respondent appealed, and this court issued an order granting respondent's motion for summary remand, with directions that respondent be given proper admonishments pursuant to Illinois Supreme Court Rule 605(c) (eff. Oct. 1, 2000), to clarify that respondent must file a motion to withdraw his guilty plea to comply with Illinois Supreme Court Rule 604(d) (eff. Dec. 11, 2014).

¶ 26          On remand, in February 2016, respondent filed a motion to withdraw guilty plea. In March 2016, the trial court resentenced defendant, pursuant to an agreement of the parties, "in accordance with the prior sentence with modifications." The new probation order reduced the term of probation to 30 months and ended respondent's home confinement. As part of the agreement, respondent withdrew his motion to withdraw guilty plea.

¶ 27          In April 2018, the State filed a petition to revoke respondent's probation, alleging that respondent committed the offense of leaving the scene of an accident. In August 2018, at a hearing, the State amended the petition to allege that respondent committed the offense of failure to reduce speed to avoid an accident. Respondent admitted the amended petition in exchange for an agreed sentence of probation until his 21st birthday, which was February 12, 2019. All other conditions of probation remained the same.

¶ 28          On February 13, 2019, the trial court entered an order discharging respondent from probation.

¶ 29                    E. The Petition To Terminate Sex Offender Registration

¶ 30          In April 2021, respondent filed a petition to terminate sex offender registration

pursuant to section 3-5(e) of SORA (730 ILCS 150/3-5(e) (West 2020)). Respondent alleged that he completed all necessary treatment required by the original sex offender evaluation and had obtained a new evaluation, which identified him as "low risk to reoffend." Respondent argued, therefore, that he posed no risk to the community. Respondent also argued that the registration requirements prevented him from taking extended trips out of state, which affected his ability to grow his business.

¶ 31　　　　In September 2021 the trial court conducted a hearing on respondent's petition.

¶ 32　　　　　　　　　　1. *Respondent's Evidence*

¶ 33　　　　　　　　　　　a. Jeff Reynolds

¶ 34　　　　Jeff Reynolds testified that he was a licensed sex offender treatment provider and evaluator at Community Resource & Counseling Center (CRCC) with a master's degree in counseling and a Ph.D. in psychology. In early 2021, respondent contacted Reynolds to obtain a sex offender evaluation. Reynolds prepared a written report of his evaluation, which the trial court admitted into evidence.

¶ 35　　　　Reynolds's report was dated February 2021 and noted that respondent was 23 at the time the report was written. Reynolds listed the documents he reviewed for the evaluation: (1) a written review of the forensic interviews of the three victims prepared by defense expert Dr. Jeffrey Kellogg for use in a hearing pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10 (West 2014)) that was conducted prior to respondent's plea; (2) the adjudicatory order; (3) a polygraph report; (4) a discharge summary from ABC Counseling; and (5) a "summary of the 'Alleged Accusations' prepared by respondent" in December 2020.

¶ 36　　　　Reynolds interviewed respondent as part of the evaluation and wrote that

respondent "was completely focused on convincing this evaluator that he was not culpable of any sexually inappropriate behaviors." Reynolds noted that "[respondent's] attitude during the interview was one of superficial cooperation" and "[respondent] was very focused on impression management throughout the process."

¶ 37　　　　Reynolds reported that, in the interview, respondent said that the "false sex offense accusations against him make him mad." Respondent also reported that he (1) "participated in and completed sexual offender treatment at ABC Counseling *** after the offenses" and (2) "attended treatment sessions for four or five months." Respondent reported seeing a therapist as an adult to address stress issues related to having to register as a sexual offender. Reynolds further wrote that, when asked about the offense, "[respondent] said that nothing ever happened and reported the entire incident was an act of revenge by the people who accused him. He said his mother was not going to allow the children to continue at her daycare center and they made up these allegations."

¶ 38　　　　Reynolds also described the instruments he administered on respondent as part of the evaluation process. On the Hare Psychopathy Checklist-Revised (PCL-R), which measures the "extent to which an individual is judged to match the prototypical psychopath," respondent scored in the 18th percentile of North American male offenders. Reynolds wrote, "While this score is not significantly elevated, it is higher than one would expect to see in the general, non-criminal population." Reynolds explained that respondent's scores on the PCL-R indicated that he "is willing and able to use and manipulate others to meet his own needs, but has been able to do this in a non-criminal manner or without getting caught."

¶ 39　　　　Reynolds also applied the Multiphasic Sex Inventory-II (MSI-II), which is "designed to identify a client's attempt to exaggerate or to deny psychopathology." Reynolds

wrote that respondent "was highly evasive on testing by not responding either true or false to a large number of items that anyone could answer. *** It would appear that he was highly uncooperative with the testing process."

¶ 40    Next, Reynolds applied three actuarial tools designed to assess risk to sexually reoffend, the STABLE 2007, ACUTE 2007, and Sexual Violence Risk-20 instrument. Respondent's scores on all three tests placed him as a low risk.

¶ 41    Reynolds concluded that, "based on the review of collateral material, the interview, and the testing material, [respondent] should be considered a low risk to sexually reoffend." In further explanation of his conclusion, Reynolds wrote the following:

"Despite his superficial cooperation with the evaluation process, there is little to suggest that he is a significant risk to the community. Current research indicates that denial of offending behavior is not a factor that elevates risk to reoffend. In addition, research suggests that juveniles who offend are statistically no more likely to offend as an adult than a juvenile who has not offended. His offenses occurred several years ago and there has been no suggestion of sexually inappropriate behavior since that time.

At this time, there appears to be no reason to suggest that [respondent] would benefit from sexual offender treatment. There appears to be no public safety issue that would be enhanced by forcing him to continue registering as a sexual offender. However, he may benefit from engaging in a course of counseling to address the resentment he carries as a result of his past experiences."

¶ 42    Reynolds testified consistent with his report. At respondent's request, the trial

- 10 -

court also admitted a copy of the ABC Counseling "Closing Summary" that Reynolds relied upon as part of his evaluation. The ABC Counseling Closing Summary stated that respondent "successfully completed treatment at ABC Counseling & Family Services on 1/27/16. However, he did not disclose ever sexually assaulting anyone."

¶ 43     On cross-examination, Reynolds acknowledged that he had not reviewed the police reports or watched the forensic interviews of the three victims prior to completing his written report. He testified that he received the police reports "earlier this week." He stated that he proceeded with the interview despite not having the police reports because he felt the polygraph report and ABC Counseling Closing Report summarized the offenses sufficiently for him to proceed. Reynolds did not know whether the polygraph examiner or ABC counselor had seen the forensic interviews of the victims. Reynolds also testified that he did not review the victim impact statements.

¶ 44     On redirect examination, Reynolds testified that the information in the police reports "basically confirmed the information that was in the reports that I reviewed that [respondent] committed these offenses against some young girls and that he subsequently pled guilty." Accordingly, Reynolds testified the police reports did not affect his conclusion.

¶ 45     The trial court asked Reynolds what effect an offender's denial of committing the offense "relates to the dealing with triggers and things that *** treatment is supposed to be dealing with?" Reynolds responded that "treatment is moving away from triggers and cycles." The court then asked, "Is that the treatment that [respondent] received?" Reynolds answered, "I don't know. That was from ABC. I'm not sure what their approach to that was."

¶ 46                              b. Sarah Tierney

¶ 47     Sarah Tierney testified that she was a licensed clinical professional counselor and

had been counseling respondent off and on over the past six years. Respondent came to her voluntarily to address the stress of the legal proceedings against him. She described him as an empathic and altruistic person and testified that she had no concerns about antisocial personality disorder with him.

¶ 48      On cross-examination, the prosecutor asked Tierney if she had reviewed any police reports in connection with respondent's case. Tierney answered that she saw the polygraph report and that she remembered seeing "some documents" but could not describe them or identify them because it was "too long ago." The prosecutor asked Tierney what was the trauma that she addressed with respondent in counseling. Tierney answered that she saw in respondent symptoms of post-traumatic stress disorder that Tierney believed was caused by "the court experience in general." Tierney testified that respondent denied committing the offenses and that Tierney believed him.

¶ 49                          c. Dawn Lanning and Cynthia Frontone

¶ 50      Dawn Lanning testified that she was a school psychologist and close family friend of respondent. She testified that respondent had created a business for himself and contributed to society. Lanning testified that she had no safety concerns regarding respondent living in her community.

¶ 51      Cynthia Frontone testified that she was a retired chaplain who counseled prisoners in the Illinois Department of Corrections. She had known respondent's family for "many years." Frontone testified that respondent did work for her and was trustworthy. She stated that, as a member of the community, she had no safety concerns for respondent. On cross-examination, she testified that she did not believe respondent sexually offended on three children.

¶ 52                          d. Respondent's Testimony

¶ 53        Respondent testified that he was currently 23 years old. In 2015, he started an online marketing company that builds and develops websites. He was largely self-taught but graduated high school and attended community college for three months. Respondent testified that his registration requirements had impaired his ability to grow his business because he could not attend out-of-state trade shows or develop out-of-state networking opportunities. Respondent further testified that he had been dating his girlfriend for four years. His registration requirement prohibited his ability to travel with her to see her family.

¶ 54        Respondent testified that his parents, brother, and close friends were a support system for him. He had continued counseling with Tierney to address "stressful situations with work or personal life." When asked why he did not answer some of the questions asked by Reynolds during the evaluation, respondent answered as follows:

> "The questions that I refused to answer were forced questions. They were grotesque and an admission of guilt. I am not here to argue anything. I agree I did take a plea deal, that advice by my previous counsel. I to this day still say I admit that I have not done this. Feel sorry for anything that has happened, but I know it wasn't me. But I did take that plea deal, so I am just taking the responsibility for it."

¶ 55        Last, respondent submitted 15 letters from members of his community attesting to his good character.

¶ 56                                    2. *The State's Evidence*

¶ 57        The State called the mother of G.G. and E.G. as a witness. She read a prepared victim impact statement. She stated that G.G. and E.G. were now 12 years old and became very upset when they discovered respondent was petitioning to be removed from the sex offender

- 13 -

registry. She reminded the court that her girls were "small children who trusted their baby-sitter's son, and he took advantage of that and pleasured himself." She stated that G.G. remembers everything and suffers from anxiety attacks. On one occasion, G.G. was admitted to the emergency room and had her heart tested to confirm she does not suffer from a heart condition but merely anxiety. The mother also said that E.G. asked what could be done to keep him on the registry "so that no one else had to go through what they went through as children."

¶ 58          The State next called G.G. as a witness. G.G. first read from a prepared victim impact statement. She stated that what respondent did caused her to have anxiety when meeting new people. She did not trust anyone, and she slept with a stuffed animal and lights on to feel safe. Her anxiety caused her hands to tremble, so she did origami "so my hands can calm down."

¶ 59          The State then asked G.G. whether she recognized respondent, and G.G. identified respondent in open court. The State asked G.G., "[D]id [respondent] put his penis in your mouth?" G.G. answered, "Yes." The State asked if she remembered it clearly, and G.G. answered, "Yes."

¶ 60          The State also presented a victim impact statement by E.G., which the trial court admitted into evidence. In the statement, E.G. wrote that, like her sister, she had anxiety as a result of respondent's actions. She asked the court "to not erase [his] record."

¶ 61          The State also presented a victim impact statement written by M.G.'s grandmother. She wrote that she suffered tremendous guilt for trusting respondent's family to care for her four-year-old grandchild. She also lamented that respondent's actions "destroyed a good friendship" as well as his mother's daycare business. M.G.'s grandmother described that respondent and his parents "have been on a long crusade to *** point the finger at us, which leads me to the anger I deal with." She continued, "Not only does [respondent] not accept the

responsibilities of his actions, but puts the blame back on his 4-year-old victims." She described that she was working as a meter reader, which required her to travel "all over this area, including the town and neighborhood where [respondent's family] lives." She stated that respondent called her supervisor to claim she was harassing respondent when "all I was doing was my job."

¶ 62    Last, the State presented a victim impact letter written by M.G. She wrote that she had "never been able to forget what happened" and that she continued to carry it as a burden. She could not tell her friends because she feared they would leave her if they knew what happened to her. She wrote that her childhood innocence was taken from her and that she did not want to see it happen again to anyone.

¶ 63                                 3. *The Trial Court's Ruling*

¶ 64    Following the arguments of the parties, the trial court issued an oral ruling denying respondent's petition. The court addressed each of the statutory factors that section 3-5(e) of SORA (730 ILCS 150/3-5(e) (West 2020)) requires a court to consider in determining whether respondent posed no risk to the community. First, the court considered the sex offender evaluation completed by Reynolds. The court noted that the evaluation determined respondent to be low risk to reoffend, but the court also found that circumstances existed that diminished the weight of Reynolds's evaluation. The court identified those circumstances as Reynolds's (1) failure to do a thorough investigation of the facts of this case and (2) reliance on respondent's completion of treatment at ABC Counseling, even though the ABC treatment did not require respondent to "confront what he pled guilty to."

¶ 65    Regarding respondent's sex offender history, the trial court found that this factor weighed against terminating respondent's registration obligation because (1) respondent offended against three victims and (2) the victims were all four years old.

- 15 -

¶ 66    Next, the court considered evidence of respondent's rehabilitation. The court acknowledged that respondent presented some positive evidence of rehabilitation, including his building his own business. The court also noted that members of respondent's community wrote letters describing him as hard working and trustworthy. Against this evidence, the court weighed (1) evidence that respondent violated his probation for fleeing and eluding, a crime of evasion, and (2) respondent's consistent denials. The court observed that respondent was "playing the victim card" and alleging that "the real victims *** are perpetrators of felony offenses against him of obstructing justice all for some sort of retaliation or retribution." The court concluded that the denial and playing of the "victim card" mitigated against finding respondent rehabilitated.

¶ 67    After considering respondent's age at the time of the offense, the trial court found that respondent's age of 15, "as juveniles go," was "towards the upper limit."

¶ 68    The court then considered information related to respondent's mental, physical, educational and social history. The court observed that respondent (1) sought counseling to deal with the stress of coming to court, (2) had friends he was close to, (3) was self-taught, and (4) was physically fit, all of which reflected positively on respondent.

¶ 69    Next, the trial court considered the victim impact statements and found that this factor weighed against terminating respondent's registration. The court distinguished between a 15-year-old offending against a 14-year-old and a 15-year-old offending against 4-year-olds, as happened here. The court observed that, under the former scenario, at the time of the hearing to terminate registration, the offender and victims are "both adults." However, the victims in the present case were still minors. The court observed that the purpose of registration was to "protect people in their tender years, being their minority years" and gave a "decent amount of weight to" this factor.

¶ 70　　　　　Next, the trial court considered the seventh statutory factor, "other factors deemed relevant by the court." The court noted the "militant nature" of respondent's denials and found that, "while it's disturbing and it does go against granting the petition, it's not a huge controlling factor." The court also noted that respondent "is surrounded by people [who] do not appear to hold him accountable." In particular, the court emphasized Reynolds's statement of respondent's "desire for impression management."

¶ 71　　　　　After discussing all of the statutory factors, the court concluded that, "[G]iven all of this, at this time I think it's premature, and I cannot find and do not find that [respondent] presents no risk *** and so I am denying the petition."

¶ 72　　　　　This appeal followed.

¶ 73　　　　　　　　　　　　　　　　II. ANALYSIS

¶ 74　　　　　Respondent appeals, arguing that (1) the trial court abused its discretion by considering non-statutory factors that had no bearing on the issue of respondent's risk to the community and (2) the court's decision was against the manifest weight of the evidence. We disagree and affirm.

¶ 75　　　　　　　　　　　　　A. Expedited Appeal Deadline

¶ 76　　　　　Initially, we note that this case is an accelerated appeal under Illinois Supreme Court Rule 660A (eff. July 1, 2018) because it arises from a final judgment in a juvenile delinquency proceeding. Rule 660A requires this court to issue its decision within 150 days after the filing of the notice of appeal unless there has been "good cause shown." Ill. S. Ct. R. 660A(f) (eff. July 1, 2018).

¶ 77　　　　　Here, respondent's notice of appeal was filed on January 4, 2022, and this court's disposition was due to be filed by June 3, 2022. Respondent requested oral argument, which was

conducted on June 28, 2022. We also note that respondent is now 24-years old and no longer a juvenile. Accordingly, given (1) the need to schedule and conduct oral argument and (2) respondent's adulthood, we conclude "good cause" exists for issuing our disposition after the 150-day deadline.

¶ 78                    B. The Applicable Law and Standard of Review

¶ 79          Section 3-5 of SORA (730 ILCS 150/3-5 (West 2020)) governs the application of SORA to juvenile sex offenders and permits a juvenile sex offender who has been adjudicated delinquent for an offense which, if committed as an adult would be a felony to petition the trial court to terminate his registration obligation after five years. The court may terminate a sex offender's registration obligation if the court finds by a preponderance of the evidence that the offender poses no risk to the community. *Id.* § 3-5(d). To determine whether a sex offender poses a risk to the community, the court shall consider the following factors:

> "(1) a risk assessment performed by an evaluator licensed under the Sex Offender
>
> Evaluation and Treatment Provider Act;
>
> (2) the sex offender history of the adjudicated juvenile delinquent;
>
> (3) evidence of the adjudicated juvenile delinquent's rehabilitation;
>
> (4) the age of the adjudicated juvenile delinquent at the time of the offense;
>
> (5) information related to the adjudicated juvenile delinquent's mental, physical,
>
> educational, and social history;
>
> (6) victim impact statements; and
>
> (7) any other factors deemed relevant by the court." *Id.* § 3-5(e).

¶ 80          A trial court's determination whether a juvenile sex offender has proved by a preponderance of the evidence that he poses no risk to the community is reviewed under the

manifest weight of the evidence standard. *In re T.J.D.*, 2017 IL App (5th) 170133, ¶ 29, 90 N.E.3d 1030. "A decision is against the manifest weight of the evidence only where an opposite conclusion is clearly apparent or where the findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *Id.* Under this standard, a reviewing court draws all reasonable inferences in support of the court's judgment and will reverse the judgment only where the opposite conclusion is clearly apparent. *Id.*

¶ 81                                        C. This Case

¶ 82                    1. *The Trial Court's Consideration of "Other Factors Deemed Relevant"*

¶ 83              Respondent argues that the trial court erred by considering "non-statutory" factors that were not relevant to determining respondent's risk to the community. Specifically, respondent contends that the court abused its discretion by factoring into its decision (1) the fact that the victims were still minors, (2) respondent's denial that he committed the offenses, and (3) that respondent was "surrounded by people who do not appear to hold him accountable."

¶ 84              Respondent concedes at the outset of his argument that section 3-5(e)(7) permits the trial court to consider "any other factors deemed relevant by the court," and he acknowledges that the trial court considered the complained-of factors under this rubric. We note that (1) section 3-5(e)(7) confers broad discretion upon the trial court to determine what factors it finds relevant and (2) respondent provides no authority supporting his argument that the court's consideration of these factors was improper. For this reason alone, respondent's argument is unavailing. However, even considering respondent's arguments on the merits, we conclude the trial court's analysis was proper.

¶ 85              a. The Victims' Ages at the Time of the Hearing on Respondent's Petition

¶ 86              Respondent first argues that the trial court erred by considering that, because the

victims were still minors at the time of the hearing, respondent's continued registration served to protect them. Respondent contends that while the general intent of SORA is to protect children from sex offenders, the intent of section 3-5 of SORA is to protect the rights of juvenile sex offenders. Thus, according to respondent, the court should not have considered the protection of children as a factor in its section 3-5 analysis.

¶ 87          Respondent's argument makes little sense. The question at the heart of section 3-5 is what risk, if any, the sex offender poses to the community. Section 3-5 explicitly permits consideration of the "victim impact statements" and "any other factors deemed relevant by the court." 730 ILCS 150/3-5(e)(6), (7) (West 2020). As the trial court pointed out, the Illinois Supreme Court in *People v. Malchow*, 193 Ill. 2d 413, 420, 739 N.E.2d 433, 438 (2000), held that "the legislature's intent in requiring registration of sex offenders was to create an additional measure of protection from the increasing incidence of sexual assault and child abuse." Whether respondent's victims are still in the community and whether they are still minors is undoubtedly relevant to the risk respondent poses to the community.

¶ 88          b. Respondent's Denial That He Committed the Offenses

¶ 89          Next, respondent argues that the trial court erroneously considered respondent's denial that he committed the offenses because "the expert testimony presented by Dr. Reynolds was that denial of guilt is not a factor in determining an offender's risk."

¶ 90          The trial court, as trier of fact, was free to determine what weight to give the evidence and testimony before it, including expert testimony. The court explained why it gave diminished weight to Reynolds's report (see *supra* ¶ 64), and the court's explanation was firmly supported by Reynolds's testimony on cross-examination.

¶ 91          In addition, in this case, respondent pleaded guilty to committing the offenses and

then proceeded to deny at every opportunity that he committed the offenses. Respondent's course of conduct is different from that of a juvenile who does not plead guilty, is adjudicated delinquent, and maintains his innocence at every stage, including trial. In contrast, respondent's conduct presents a question of his veracity, which is relevant to a determination of his rehabilitation and risk to reoffend. This is particularly true in the present case given that respondent (1) scored high on the PCL-R, which indicates respondent "is willing and able to use and manipulate others to meet his own needs" and (2) was "highly evasive" in the MSI-II, which was designed to identify an offender's "attempt to exaggerate or to deny psychopathology."

¶ 92    In short, the trial court was not obligated, as respondent seems to argue, to accept anything in Reynolds's report as determinative on the same issue the trial court was called upon by law to determine: respondent's risk to the community. Instead, the court properly assessed respondent's denials in the context of the entire case.

¶ 93        c. Respondent's Lack of Accountability From Family and Friends

¶ 94    Third, respondent argues that the trial court erred by considering that respondent "is surrounded by people who do not appear to hold him accountable." Respondent asserts that "this factor is intertwined with the court's consideration of [respondent's] continued assertion of innocence" and the fact "that others in [respondent's] community hold an opinion that he poses no risk based on their interactions with him should be a factor in favor of granting his petition, not denying it."

¶ 95    Again, respondent offers no authority in support of his argument that the trial court abused its discretion by considering this factor. The trial court found this factor relevant to its analysis, and we agree. The numerous character letters respondent submitted on his behalf demonstrate that the members of respondent's community believe he did not commit the

offenses to which he pleaded guilty. The author of one letter wrote, "When [respondent] was first confronted with these charges[,] I knew in my heart they were false and that he had been falsely accused." Another wrote, "I strongly believe that [respondent] *** is the true victim of a false accusation and a fault in our justice system." And yet another wrote, "After hearing about [respondent's] charges, I was instantly sick to my stomach that someone really did this to him."

¶ 96    If respondent believes he is the true victim, he is unlikely to change the behaviors or thought patterns that led to his behaviors. And the community members' similar belief that respondent is innocent suggests that community members will be more likely to give respondent opportunities to reoffend than they likely would if they recognized the fact that respondent committed sexual offenses against four-year-old children at his mother's daycare. Accordingly, respondent's residence in a community that does not hold him accountable is relevant to the risk respondent poses to that community.

¶ 97    For these reasons, we conclude that the trial court's consideration of (1) the victims' ages, (2) respondent's denial that he committed the offenses, and (3) respondent's being surrounded by people who do not hold him accountable was not improper and the trial court did not abuse its discretion.

¶ 98    2. *The Trial Court's Decision Was Supported by the Evidence*

¶ 99    Respondent also argues that the trial court's denial of respondent's petition was against the manifest weight of the evidence. Respondent contends that he proved by a preponderance of the evidence that he posed no risk to the community, pointing specifically to (1) the "significant" evidence of his rehabilitation and (2) the sex offender evaluation classifying him as a low risk to reoffend.

¶ 100    Respondent relies primarily on *In re B.C.*, 2018 IL App (3d) 170025, ¶ 1, 99

N.E.3d 142, in which the Third District reversed and remanded a trial court's denial of a petition to terminate registration with instructions to grant the petition. Respondent is correct that factual similarities exist between the present case and *B.C.* However, we agree with the trial court that *B.C.* is distinguishable from the present case.

¶ 101     In *B.C.*, the petitioner was 14 years old when he committed aggravated criminal sexual abuse (720 ILCS 5/12-16(c)(2)(i) (West 2000)) against two minors who were under 9 years old. *B.C.*, 2018 IL App (3d) 170025, ¶¶ 3, 6, 10. In 2016, the petitioner in *B.C.* filed a petition to terminate his registration and presented positive evidence of his rehabilitation, including his graduation from high school, attendance at community college, and full-time employment. *Id.* ¶ 10. The petitioner also presented evidence that he had successfully completed sex offender treatment and had been evaluated as low risk to reoffend. *Id.* ¶¶ 13-14.

¶ 102     Importantly, the trial court in the present case found that the following facts distinguished *B.C.* from respondent's case. The evaluator in *B.C.* "explained that the biggest factor in preparing the assessment was determining whether B.C. understood his actions were wrong and how to prevent the behavior in the future." *Id.* ¶ 15. The evaluator testified that B.C. "had fully accepted responsibility for his offenses [and] understood his triggers." *Id.* ¶ 17. The evaluator also testified that B.C.'s sex offender treatment had taken four years and consisted of three phases, including (1) learning accountability for deviant behavior, (2) understanding cognitive errors that led to the offender's poor choices, and (3) managing and understanding the offender's triggers and high-risk areas. *Id.* ¶ 14.

¶ 103     Unlike in *B.C.*, respondent has (1) never accepted responsibility or accountability for his actions, (2) engaged in treatment that accepted as a premise that he never committed a sex offense, and (3) surrounded himself with people who denied the existence of respondent's risk

areas or triggers.

¶ 104    Turning to the trial court's analysis of the evidence in this case, we conclude that the court's denial of respondent's petition to terminate registration was supported by the evidence. As to the sex offender evaluation, Reynolds assessed respondent as low risk to reoffend. However, the trial court explained that it gave diminished weight to Reynolds's assessment because he did not fully apprise himself of the underlying facts of the case and he relied on respondent's successful completion of ABC Counseling, which the court found to be inadequate because it did not require respondent to confront his behaviors. Moreover, the evaluation established that respondent was (1) willing to lie and manipulate to manage his image, (2) was superficially cooperative, and (3) was highly evasive. The trial court's finding that Reynolds's low risk assessment should be afforded diminished weight is supported by the evidence.

¶ 105    Regarding the sex offender history of respondent, he offended against three victims who were four years old. The trial court correctly identified this factor as "significant," and we agree that it supported denying respondent's petition, particularly when weighed against respondent's age of 15 at the time of the offenses. The court correctly noted that respondent was significantly older than his victims and much nearer to adulthood. This is not a case where respondent was a young child who perpetrated on his peers.

¶ 106    Regarding respondent's rehabilitation, we acknowledge, as did the trial court, that respondent presented some positive evidence of rehabilitation. Namely, respondent finished school, started a business, voluntarily engaged in counseling, and developed a reputation in his community for trustworthiness, all of which are positive steps toward being a productive member of society. However, the court expressed concerns about the authenticity of respondent's

rehabilitation, noting, "[I]n the sense of his impression management [respondent] does a good job in impressing the people he meets." We agree with the trial court that it is difficult to ascertain whether respondent is truly rehabilitated or whether he merely excels at "impression management." Accordingly, the trial court correctly concluded that respondent's positive evidence of rehabilitation is mitigated by the questions about his veracity. In particular, respondent's convincing his parents and community that he is the true victim and that his child "accusers" and their families are the true offenders is inconsistent with his plea of guilty and the evidence in this case.

¶ 107 Regarding respondent's mental, physical, educational, and social history, the trial court pointed out that respondent sought counseling to deal with the stress of his court involvement and called it the "mature approach." The court also noted that respondent had friends, was educated, and is physically fit. The court engaged in little discussion of these factors other than noting them as positive. We agree that these are positive factors, but they do not outweigh some of the more serious concerns identified by the trial court.

¶ 108 Regarding the sixth and seventh statutory factors, the "victim impact statements" and "other factors deemed relevant by the court," we have discussed those in detail *supra* (¶¶ 82-97) and need not repeat that discussion here. We simply note that we conclude the trial court's consideration of those factors was proper, and those factors weigh against respondent.

¶ 109 The trial court concluded that respondent did not prove by a preponderance of the evidence that he posed no risk to the community. Having reviewed the evidence and the trial court's analysis, we conclude that the trial court's judgment denying respondent's petition to terminate his sex offender registration was supported by the evidence.

¶ 110 III. CONCLUSION

¶ 111    For the reasons stated, we affirm the trial court's judgment.

¶ 112    Affirmed.