NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 220426-U

NO. 4-22-0426

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 14, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* B.S., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | No. 19JA89 |
| v. | ) | |
| Victor S., | ) | Honorable |
| Respondent-Appellant). | ) | Dwayne A. Gab, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Zenoff and Doherty concurred in the judgment.

**ORDER**

¶ 1    *Held:*    The appellate court affirmed the judgment of the trial court terminating
respondent's parental rights because the trial court's fitness and best interest
findings were not against the manifest weight of the evidence.

¶ 2    Respondent, Victor S., is the father of B.S. (born May 2011). In May 2022, the

trial court found respondent was an unfit parent under the Adoption Act (see 750 ILCS

50/1(D)(b), (m)(i), and (m)(ii) (West 2020)) and that termination of respondent's parental rights

would be in B.S.'s best interest.

¶ 3    Respondent appeals, arguing that the trial court's fitness and best-interest

determinations were against the manifest weight of the evidence. We disagree and affirm.

¶ 4                                    I. BACKGROUND

¶ 5    We note that B.S.'s mother, Sharon S., has filed a separate appeal. However,

because she and respondent lived together and maintained a relationship throughout this case, we

will discuss facts pertaining to Sharon insofar as they are relevant to respondent's claims on appeal.

¶ 6                                    A. Procedural History

¶ 7            In May 2019, the State filed a petition for adjudication of wardship, alleging that B.S. was (1) neglected in that he lived in an environment that was injurious to his welfare "as evidenced by domestic violence between his parents" (705 ILCS 405/2-3(1)(b)) (West 2018)) and (2) abused "in that the minor has been physically abused by his father [(*id.* § 2-3(2))]." Three days after the petition was filed, the trial court conducted a shelter care hearing and placed temporary guardianship and custody of B.S. with the guardianship administrator of the Department of Children and Family Services (DCFS).

¶ 8            In October 2019, the trial court conducted an adjudicatory hearing. B.S. testified that he once saw respondent choke Sharon after "they both got mad at each other, and then they started to kind of fight a little." After B.S. testified, respondent advised the trial court that he would stipulate to the first allegation in the petition (neglect) and the State would withdraw the second allegation (abuse). The court (1) found that B.S.'s testimony provided a factual basis for the allegation of neglect, (2) accepted respondent's stipulation to the neglect allegation, and (3) adjudicated B.S. a neglected minor.

¶ 9            In November 2019, the trial court conducted a dispositional hearing and found respondent unfit and unable for reasons other than financial circumstances alone to care for, protect, train, educate, supervise, or discipline the minor. The court also made B.S. a ward of the court and placed custody and guardianship of B.S. with the guardianship administrator of DCFS. The court admonished respondent that he needed to cooperate with DCFS and complete services or he risked termination of his parental rights. In its written order, the court noted that the

"[respondent] must engage in and show progress in domestic violence services."

¶ 10      In March 2020, B.S. was returned to live with respondent and Sharon. However, in July 2020, police officers arrested respondent for a domestic dispute with a friend that occurred in front of B.S. and Sharon. After the incident, Sharon moved with B.S. out of the residence, reported the incident to the State, and later that month, signed a DCFS safety plan that required Sharon and B.S. to stay away from respondent.

¶ 11      In September 2020, Sharon returned to live with respondent in violation of the safety plan, leaving B.S. with his maternal grandmother. B.S. was then taken back into DCFS custody.

¶ 12           B. The Petition for Termination of Parental Rights

¶ 13      In July 2021, the State filed a petition to terminate respondent's parental rights. The State alleged respondent was an unfit parent within the meaning of the Adoption Act (750 ILCS 50/1 *et seq.* (West 2020)) due to his (1) failing to maintain a reasonable degree of interest, concern, or responsibility as to B.S.'s welfare, (2) abandoning B.S., (3) deserting B.S. for more than three months prior to the petition's filing, (4) failing to make reasonable efforts to correct the conditions that were the bases for the removal of the child from the parent within nine months after an adjudication of neglect—specifically, October 2019 to July 2020, and July 2020 to April 2021, and (5) failing to make reasonable progress toward the return of the child to the parent during those same nine-month periods. See *id.* §§ 1(D)(b), (a), (c), (m)(i), (m)(ii).

¶ 14           1. *The Fitness Portion of the Termination Proceedings*

¶ 15      In January 2022, the trial court conducted a hearing on the parental fitness portion of the termination proceedings. At the beginning of the hearing, the court, at the State's request and without objection, took judicial notice of all orders previously entered, including the

adjudicatory and dispositional orders.

¶ 16                                    a. Alyse Borla

¶ 17        Alyse Borla testified that she previously worked at Family Service Center (FSC) and was the caseworker on this case from August 2019 to November 2020. Borla stated that, after her involvement, the case was transferred to a different agency—the Center for Youth and Family Services (CYFS)—to avoid a conflict of interest because B.S.'s foster parent at that time, who was his maternal grandmother, "knew" a supervisor at FSC.

¶ 18        Borla testified that in October 2019 she established a "service plan" that required respondent to (1) cooperate with the agency, (2) complete domestic violence classes, (3) maintain appropriate housing and income, (4) attend visits with B.S., (5) complete parenting classes, and (6) complete a substance abuse assessment. Borla testified that she discussed the service plan with respondent and he appeared to understand that he needed to complete the services.

¶ 19        Regarding visitation, Borla stated the following.

> "So, in the beginning, visitation was weekly. It was supervised at our agency. I believe it started out being two hours per visit. And then about six months in, when [the] parents were doing well with their services, we increased visits to twice a week. They were moved into the home, and then they were moved to unsupervised later down that road [in January 2020.]"

¶ 20        Borla testified that B.S. was "returned home" in March 2020, and remained there until July 2020, at which time a "domestic dispute" occurred between respondent and a friend who was in the home at the time. Borla testified that B.S. had been "just returned home to mom [(Sharon)] and we put a safety plan in place." The safety plan required Sharon and B.S. to "not

be in [respondent's] presence." Borla intended to reevaluate the situation after respondent completed his service plan. Borla testified that Sharon initially moved out, but in September 2020, Sharon violated the safety plan by returning to live with respondent. Sharon left B.S. with her parents, and B.S. was taken back into care.

¶ 21     Regarding respondent's performance on his service plan from October 2019 to July 2020, Borla testified that respondent attended most of his scheduled visits with B.S. and completed only the parenting classes. However, respondent did not complete the domestic abuse classes because he was forced to restart them after the July 2020 domestic dispute. Borla explained that respondent tested positive for marijuana during his substance abuse assessment but, because marijuana was being legalized at the time, substance abuse classes were not recommended. Ultimately, respondent's performance of his service plan from October 2019 to July 2020 "was unsatisfactory because that's when that domestic dispute happened. If that domestic dispute did not happen in July, he would have been [rated] satisfactory because he was doing everything else we asked him." Borla stated that domestic violence was the reason B.S. came into care, "[w]hich is why we saw it as unsatisfactory."

¶ 22     Regarding the second nine-month period from July 2020 to April 2021, Borla stated the following: "The third [service plan] was unsatisfactory. That, unfortunately, was after the positive cocaine drop [in September 2020]. So, a lot of his—and he wasn't in [the domestic violence for perpetrators class] anymore, so a lot of his tasks actually were unsatisfactory on that service plan."

¶ 23     Borla testified that, up until October 2020, respondent and Sharon "were very good with contact. *** They were very involved." But Borla further testified that "when Sharon went back to [respondent], *** things kind of went downhill there. They came so far, and I think

it was just a really big setback that they maybe couldn't come back from. So that was—it was hard to contact them around that time." Borla attempted to contact the parents by phone, text, and in person.

¶ 24　　Borla also testified that during the second nine-month period following the July 2020 incident, respondent did not complete domestic violence classes or substance abuse treatment, which was required after he tested positive for cocaine in September 2020. Borla testified that respondent "needed to complete a domestic violence class that needed to be for perpetrators specifically."

¶ 25　　On cross-examination, Borla was asked about the incident in July 2020 that caused Sharon and B.S. to move out of their house. Borla said that respondent had told her he was in his house with a friend and caught the friend doing drugs in the bathroom. Respondent tried to physically force the man out of the house and ripped his friend's shirt in the process. The incident took place in front of B.S. and Sharon. Borla talked to B.S. about the event, and he told her that he was very scared that there was fighting and hitting.

¶ 26　　　　　　　　　　　b. Pua Deshmukh

¶ 27　　Pua Deshmukh testified that she was the caseworker from November 2020 until October 2021.

¶ 28　　Deshmukh testified that communication with respondent was spotty but he would eventually return her phone calls. Deshmukh said that while she was assigned to this case, respondent completed anger management classes. However, at a meeting to review the service plan in May 2021, Deshmukh rated his progress as unsatisfactory because he had not completed all of the services.

¶ 29　　Regarding visits, Deshmukh testified that they started off as virtual and in person,

"virtual one week, in person the next, two hours each time," but eventually became in-person for two hours each week. Deshmukh "supervised quite a few of them." Deshmukh testified that the quality of the visits "kind of all seemed surface level. *** There were a couple times [B.S.] called [his] foster parent 'mom,' and both parents didn't like that and told him he couldn't call her that. *** There was no connection it seemed like."

¶ 30    Deshmukh recalled that during one visit in 2021, "we all kind of just got to chatting, and [respondent] had just mentioned how he had made some poor choices back in the day and how he had choked out [Sharon] and a couple other things." A case aid then stepped in to say "[w]e're not allowed to be talking about stuff like that in front of [B.S.]" Respondent then apologized. Deshmukh testified "that was the last time it happened."

¶ 31    Although communication was sporadic, Deshmukh never had to "track down" the parents to get ahold of them. Regarding drug drops, respondent appeared at only 8 of the 42 scheduled drops.

¶ 32    On cross-examination, Deshmukh said that respondent was not cooperative in terms of communication, visits, or drug drops. He was gone most of the time, working on jobs out of town, "getting paid under the table [and missing] visits knowing that they were scheduled for that day." Deshmukh acknowledged that respondent did complete parenting and anger management classes but never completed substance abuse treatment.

¶ 33    Around September 2021, Deshmukh repeatedly told respondent to call Family Guidance, a substance abuse treatment provider, to make an appointment to begin the substance abuse classes. At some point, respondent "was established for outpatient" there, but because he did not engage with the classes, he was unsuccessfully discharged and had to wait 28 days to restart the classes. Deshmukh asked respondent multiple times to restart classes and he always

said he would do it. However, Deshmukh never received confirmation that respondent completed the classes.

¶ 34    Deshmukh recalled one instance in which respondent and Sharon sent her "very disrespectful" texts after a visit was cancelled in September 2021 because the case worker, who was meant to supervise the visit, was sick with COVID-19. Deshmukh found out about the cancellation with only 30 minutes notice, at which time respondent and Sharon called her to see if she could still make the visit happen. Deshmukh told them that she already had a full schedule, but she would see what she could do. At that point, they started "blowing up [Deshmukh's] phone being very disrespectful, and [she] was getting cussed out on both angles."

¶ 35    However, Deshmukh did "end[ ] up making it work, and [she] texted both of them, telling them [she] was at the office with [B.S.]" She further testified that the policy was to wait only 15 minutes for parents to show up but she gave respondent and Sharon 30 to 45 minutes that day after talking to them "an hour before hand." Nonetheless, neither parent showed up to the visit.

¶ 36    When asked whether "[d]uring [her] time on the case, was there ever a time when [she was] close to returning the child back to [the parents]," Deshmukh answered, "No."

¶ 37                    c. Megan Graham

¶ 38    Megan Graham testified that she was the current caseworker and received the case in October 2021. She testified, "[S]ince I've had the case, it looks like nothing had been done. They have not contacted me about their services since I've taken the case over in October [2021]."

¶ 39    In November 2021, the parents had only a one-hour visit with B.S. because they had not made any progress with their services. During Graham's time on the case, respondent

and Sharon had been uncooperative. It took a lot of "teeth pulling" to get a hold of them. The only time Graham heard from them was when they had a visit with B.S. She repeatedly asked respondent and Sharon how they were doing with their services, but they did not answer her until they were ready to visit with B.S.

¶ 40            Graham had scheduled random drug drops for respondent, but he missed all but one, which was in December 2021. Respondent's test was positive for marijuana use.

¶ 41            Graham testified that she supervised only one visit, but in her opinion respondent was very inappropriate at that visit. Respondent showed up to the visit smelling very strongly of marijuana. At the same visit, B.S. and respondent were playing a game in which B.S. had to guess what word respondent was thinking about by giving B.S. hints with other words. The word respondent chose was a swear word, but she could not remember which word it was.

¶ 42            Graham also testified that respondent had been on Facebook asking people for money, gas, and a place to stay. He and Sharon were sleeping in his car and in motels. Graham said that since she had been working on this case, she never felt that she could recommend returning B.S. to either parent.

¶ 43                            d. Respondent

¶ 44            Respondent testified that had been residing at the Midtown Inn with Sharon for the last three months. When B.S. was returned home in March 2020, respondent had completed all the tasks in his service plan except anger management. Respondent was not employed because he received social security disability payments each month. According to respondent, he provided his caseworker with a copy of his disability benefits at one point. From the time the case began until March 2020, he had visits with B.S. twice a week. Before the July 2020 incident, respondent had completed 22 out of 26 of his domestic violence classes but said that

after the incident he was required to restart the classes. Subsequently, he found alternative classes offered through a church, which he completed in April 2021. Respondent stated that those classes taught him how to handle his temper and the various forms that abuse can take.

¶ 45          According to respondent, he cooperated with drug drops ordered by the agency. Respondent admitted to using marijuana recreationally and that he consistently tested positive for it. In September 2020, he tested positive for cocaine but asserted he had never knowingly used cocaine, explaining, "At that time that I was tested, I had went [*sic*] to a Christmas party, and I indulged in smoking marijuana with people that I did not know, and I didn't know if there was anything else in it."

¶ 46          On cross-examination, the State pointed out that respondent tested positive for cocaine in September and questioned whether he really attended a Christmas party. Respondent answered, "It was just a barbecue I went to." Respondent testified that he did not miss any drug tests but, after further questioning, admitted that he could have missed several.

¶ 47          When asked why he was staying in a motel, respondent said that his landlord evicted him, but he was saving up money to rent a new house. He believed that he was a fit parent, had a close relationship with B.S., and B.S. was always happy to see him at visits.

¶ 48          Regarding the July 2020 incident, respondent admitted that although he learned anger management techniques from his classes, he did not control his temper when he grabbed his friend's shoulders, ripped his shirt, and threw him out of the house, resulting in respondent's arrest. Respondent also admitted that Sharon and B.S. were home at the time of the incident.

¶ 49          When asked why B.S. was taken into care, respondent blamed his mother-in-law, who allegedly called DCFS. He said, "[A]pparently, she made a call to the right people to get stuff done for her." Respondent testified that he did not recall B.S. saying that respondent had

struck him and denied that any domestic violence had occurred in his house when B.S. was taken into care. However, respondent acknowledged that Sharon went with B.S. to live at Sojourn House, which was a place that provided safety for victims of domestic violence. On redirect examination, respondent continued to say that he had never been physically violent with Sharon or B.S. However, respondent acknowledged that he engaged in verbal abuse and said that was inappropriate.

¶ 50                                      e. Amy Varner

¶ 51          Amy Varner testified that she was respondent's sister. Varner said that before DCFS got involved, she visited respondent, Sharon, and B.S. around three times a week and had never witnessed respondent being violent with Sharon or B.S. Varner testified that she never witnessed any parenting that was inappropriate. In fact, she never even saw respondent scold B.S. Varner further testified that respondent had never hurt her or been inappropriate with other family members, either. Varner acknowledged that she had seen respondent use marijuana recreationally but never to excess and never in front of B.S. When asked if she had seen any positive changes in respondent throughout his involvement with DCFS, Varner said, "There wasn't really changes to be had."

¶ 52                               g. The Trial Court's Decision

¶ 53          In May 2022, the trial court conducted a hearing to issue its ruling. The court began by stating that it took judicial notice of a stipulation of facts from October 2019, which specified, among other things, "domestic violence reports between the parents," some of which "occurred before the minor."

¶ 54          The trial court found by clear and convincing evidence that the July 2020 incident was an instance of domestic violence. The court then stated the following:

"In regards to the July '20 incident, there was substantial testimony by [respondent] about what happened. There was also testimony by Ms. Borla in relationship to what the minor said happened and how he felt about it. And that is the basis for my finding of the significance of the July '20 incident. And I think the September of '20 return of the child to the Department of Children and Family Services and reengagement by [Sharon and respondent] as a couple also was a very significant event in the course of this case."

¶ 55      The trial court found Borla to be credible and helpful, quoting her testimony that "when Sharon went back to [respondent], things kind of went downhill from there." Important to the court was respondent's testimony regarding the July 2020 incident. The court noted that respondent (1) did not believe the incident was domestic violence and (2) felt that he was being treated unfairly by having to take a whole new domestic violence class. The court recognized that respondent admitted that he handled the situation inappropriately and did not follow through with the training he had received.

¶ 56      The trial court also stated that it found "more troubling" the fact that "[respondent] continued to minimize and *** there was no realization of the domestic violence that was occurring or insight into how to avoid it." The court also found the positive drug test for cocaine to be concerning because respondent did not adequately address why he tested positive. The court noted that respondent stated he somehow consumed cocaine at a Christmas party but after being asked how that could have been because the test was in September, he changed his story.

¶ 57      The trial court found that the State had proved by clear and convincing evidence that respondent was unfit because he failed to (1) maintain a reasonable degree of interest,

concern, or responsibility as to the minor's welfare, (2) make reasonable efforts to correct the conditions which were the basis for removal of the minor during the relevant nine-month periods, and (3) make reasonable progress toward the return of the minor within nine months after an adjudication of neglect under the Adoption Act.

¶ 58    The trial court then entered a written order finding respondent unfit under sections 1(D)(b), (m)(i), and (m)(ii) of the Adoption Act (750 ILCS 50/1(D)(b), (m)(i), (m)(ii) (West 2020)) and continued the case for a best interest hearing.

¶ 59            2. *The Best-Interest Portion of the Termination Proceedings*

¶ 60    Later in May 2022, the trial court conducted the best interest hearing.

¶ 61                        a. Meghan Graham

¶ 62    Graham testified that she was the current caseworker for B.S. and that he had a fictive kin placement with Jennifer and Scott Miller for "about two going on three years." She opined that B.S. was doing very well at the placement and he was thriving. Graham further testified that she personally observed the bond that the foster family had with B.S. She stated, "They go out on outings all the time together. They go on family vacations. The foster family has included [B.S.] in family photos, family outings, family gatherings. He calls the foster parents mom and dad. And he calls his foster siblings brother and sister." The Millers would adopt B.S. if given the opportunity and had already adopted other foster children. Graham further stated that she believed it would be in B.S.'s best interest to terminate respondent's parental rights.

¶ 63    Graham stated, "I've just seen [B.S.] thrive. Since I've taken the case over in October, he's just been thriving. He's happy where he is, and I just, I really think this would be the best place for him."

¶ 64    Graham was also asked whether any incidents of domestic violence occurred

during the life of the case. She responded that based on her reading of the investigation report, two incidents had occurred. She did not remember the first incident between respondent and Sharon very well. However, regarding the second incident, Graham stated that "[respondent] got into an argument with his roommate and also physically hurt [B.S.]" and "[respondent] was extremely angry after the argument with his roommate, which then was cause to hurt [Sharon] and [B.S.]"

¶ 65                                          b. Respondent

¶ 66           Respondent testified that he had found housing in the form of a trailer later in May 2022 and that he had a close bond with B.S. Respondent stated that B.S. had lived with him for his whole life. Before this case, he and B.S. would play sports together and attend church nearly every Sunday. Respondent said that B.S. would sometimes tell him during visits that he "wanted to come back home to his mother and father."

¶ 67                                  c. The Trial Court's Ruling

¶ 68           Initially, we note that during closing arguments, respondent pointed out that some of Graham's testimony regarding the July 2020 incident was not accurate. The guardian *ad litem* agreed that "there was testimony [during the hearing] that was different or at least supplemental that [he] didn't hear the first time."

¶ 69           The trial court began its decision by stating that it found Graham's testimony regarding the July 2020 incident to be "inaccurate" and would not "rely on that new information." However, the court found Graham's testimony regarding the foster parents to be credible.

¶ 70           The trial court then emphasized that respondent did not demonstrate that he recognized "the dangers of domestic violence." The court stated the following:

"So physical safety, development of child's identity, culture, familial, religious background, and ties; I mean, all that. If you live in a home that has domestic violence, none of that develops. And I'm absolutely positive [domestic violence] is not going on in the foster parents' home. I do believe there is bonding with the foster parents. I do believe that he calls them his family.

I think he has two families, but this is the nurturing family when I look at it, the foster parents. Not only that, but I think they're uniquely able to deal with the problems [B.S.] will suffer from because of his home life previously and just the sheer fact that he's a foster kid. They've already adopted two kids. He has people that act as his family and his brothers that are in the same situation as him. I can't think of a better situation to place this kid in because of the fact that all of the necessary—I don't want to say training—but all the necessary attributes and support that he needs he's already gone through in that placement.

And I'm very impressed that the foster parents are not only, you know, foster parents to [B.S.] but are foster parents to two other children of like situation. I believe that there was evidence to a level of preponderance in regards to the bonds with that family, the fact that the child is doing well, that he has become part of that family."

¶ 71     The trial court concluded its ruling by finding that termination of respondent's parental rights was in B.S.'s best interest.

¶ 72     This appeal followed.

¶ 73                          II. ANALYSIS

¶ 74     Respondent appeals, arguing that the trial court's fitness and best-interest

- 15 -

determinations were against the manifest weight of the evidence. We disagree and affirm.

¶ 75                                    A. The Trial Court's Fitness Finding

¶ 76            We first note that we can affirm the trial court's fitness determination on any

ground that the trial court found respondent unfit. *In re J.O.*, 2021 IL App (3d) 210248, ¶ 33.

Accordingly, because we conclude that respondent failed to make reasonable progress towards

B.S.'s return during the nine-month period of July 2020 to April 2021, we address only that

ground for unfitness.

¶ 77                              1. *The Applicable Law and the Standard of Review*

¶ 78                                    a. The Standard of Review

¶ 79            A determination of parental unfitness involves factual findings and credibility

determinations that the trial court is in the best position to make because "the trial court's

opportunity to view and evaluate the parties *** is superior." (Internal quotation marks omitted.)

*In re M.I.*, 2016 IL 120232, ¶ 21, 77 N.E.3d 69. "A trial court's finding of parental unfitness will

not be reversed unless it is against the manifest weight of the evidence." *In re Ta. T.*, 2021 IL

App (4th) 200658, ¶ 48, 187 N.E.3d 763. "A trial court's decision is against the manifest weight

of the evidence only if the opposite conclusion is clearly apparent or the decision is

unreasonable, arbitrary, or not based on the evidence." *In re N.B.*, 2019 IL App (2d) 180797,

¶ 30, 125 N.E.3d 444.

¶ 80                                    b. The Law Regarding Reasonable Progress

¶ 81            The State must prove unfitness as defined in section 1(D) of the Adoption Act

(750 ILCS 50/1(D) (West 2020)) by clear and convincing evidence. *In re N.G.*, 2018 IL 121939,

¶ 28, 115 N.E.3d 102. Section 1(D)(m)(ii) of the Adoption Act defines an unfit person as a

parent who fails to make "reasonable progress toward the return of the child" during any

nine-month period following an adjudication of neglect or abuse. 750 ILCS 50/1(D)(m)(ii) (West 2020). The Illinois Supreme Court has held that "[t]he benchmark for measuring a parent's reasonable progress under section 1(D)(m) of the Adoption Act encompasses compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent." *In re K.P.*, 2020 IL App (3d) 190709, ¶ 36, 157 N.E.3d 493 (citing *In re C.N.*, 196 Ill. 2d 181, 216-17, 752 N.E.2d 1030, 1050 (2001)).

¶ 82    Likewise, this court has defined "reasonable progress" as follows:

" 'Reasonable progress' is an objective standard which exists when the court, based on the evidence before it, can conclude that the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child." (Emphases in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991).

See also *K.P.*, 2020 IL App (3d) 190709, ¶ 36.

¶ 83                                    2. *This Case*

¶ 84    In the present case, the trial court found respondent unfit for failing to make reasonable progress from July 2020 to April 2021 because respondent did not complete his service plan during that time. Respondent argues that this finding was unreasonable because he did in fact complete his requested services during that time period, characterizing any lack of

engagement as "mistakes, errors in judgment, or unsolicited challenges." We disagree.

¶ 85        Simply put, respondent did not follow through with his obligations. Respondent testified that he completed his services, but Borla and Deshmukh stated the contrary. And based on the record, the trial court found respondent not credible. We will not substitute our judgment for that of the court on the issues of witness credibility, the weight to be afforded to evidence, or the inferences to be drawn from that evidence. *Ta. T.*, 2021 IL App (4th) 200658, ¶ 65.

¶ 86        Borla and Deshmukh both testified that during the July 2020 to April 2021 period, respondent received unsatisfactory ratings for his service plans. Respondent tested positive for cocaine in September 2020, did not attend substance abuse treatment (despite Borla's referrals), and missed the overwhelming majority of his random drug drops. Further, when respondent was asked at the fitness hearing how he may have consumed cocaine, he responded that it occurred at a Christmas party. When asked how that could be because the positive test was in September, respondent changed his story to claim it occurred at a barbecue.

¶ 87        The trial court found this discrepancy troubling, stating that his testimony "doesn't demonstrate any kind of particular honesty or, at best, perhaps minimization of what happens here." A reasonable inference to be drawn from these facts is that respondent had a drug problem and avoided the drug tests because he would likely test positive. See *In re B.C.*, 2018 IL App (3d) 170025, ¶ 30, 99 N.E.3d 142 ("In reviewing the court's ruling, we draw all reasonable inferences in support of the court's judgment.").

¶ 88        Not only did respondent not cooperate with drug drops and drug abuse treatment, he also stopped communicating with the caseworkers around October 2020. Regarding visits, respondent neither communicated with the caseworkers nor made all the visits, which were scheduled for a specific time and day. Instead, respondent chose to work out of town at jobs for

which he was paid "under the table." And, when he did make the visits, Deshmukh testified that they were "surface level" visits. According to her, at no time was respondent close to getting B.S. returned to his custody.

¶ 89    Further, at the fitness hearing, respondent did not take responsibility for his actions. Instead, respondent minimized the violent environment to which he exposed B.S. and denied that domestic violence had occurred at all. When the State asked why B.S. was removed from his care after the July 2020 incident, respondent blamed his mother-in-law.

¶ 90    In sum, respondent was uncooperative with his caseworkers, disclaimed responsibility for his actions, and was nowhere near a point where B.S. could be returned to his custody. Accordingly, we conclude that the trial court's fitness finding was not against the manifest weight of the evidence.

¶ 91              B. The Trial Court's Best Interest Finding

¶ 92              1. *The Applicable Law and the Standard of Review*

¶ 93    At the best interest portion of termination proceedings, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71, 145 N.E.3d 605. In reaching a best-interest determination, the trial court must consider, within the context of the child's age and developmental needs, the following factors:

> "(1) [T]he child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for

permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." (Internal quotation marks omitted.) *In re J.B.*, 2019 IL App (4th) 190537, ¶ 32, 147 N.E.3d 953.

See also 705 ILCS 405/1-3(4.05) (West 2020).

¶ 94 A reviewing court affords great deference to a trial court's best-interest finding because the trial court is in a superior position to view the witnesses and judge their credibility. *C.P.*, 2019 IL App (4th) 190420, ¶ 71. An appellate court "will not disturb the trial court's decision regarding a child's best interests *** unless it is against the manifest weight of the evidence." *Id.* ¶ 68. A best-interest determination is against the manifest weight of the evidence only when the opposite conclusion is clearly the proper result. *Id.*

¶ 95 2. *This Case*

¶ 96 Respondent argues that the trial court's best interest finding was against the manifest weight of the evidence because of his "strong bond" with B.S. and that his "family deserves the right to be united." We disagree.

¶ 97 At the best interest hearing, the State presented Graham's testimony about B.S.'s foster placement, which the trial court found credible.

¶ 98 Graham testified that (1) the Millers planned to adopt B.S., (2) B.S. had been living with them for over two years, (3) he was thriving with the Millers, (4) he was safe and free from domestic violence, (5) the Millers had already adopted other children, giving them experience with foster children, and (6) Graham had personally witnessed the bond between B.S. and the Millers as well as the bond between all of the foster family members and B.S. Further,

Graham said that the foster family took B.S. with them on family outings and vacations. B.S. was also included in family photos. He called his foster parents "mom" and "dad," and he called his foster siblings "brother" and "sister." Because of her observations, Graham opined that termination of respondent's parental rights would be in B.S.'s best interest.

¶ 99　　　　In addition, based on respondent's testimony, the trial court found that he did not recognize the dangers of domestic violence or how "physical safety, development of [a] child's identity, culture, familial, religious background, and ties" do not develop in that environment. We agree.

¶ 100　　　　Given these factual findings, we conclude that the trial court's best-interest determination was not against the manifest weight of the evidence. Accordingly, we affirm the court's judgment terminating respondent's parental rights.

¶ 101　　　　　　　　　　　III. CONCLUSION

¶ 102　　　　For the reasons stated, we affirm the trial court's judgment.

¶ 103　　　　Affirmed.